1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| ESTATE OF ARIEL TORRES, et al., | Case No. 1:24-cv-00731-KES-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al., | (ECF No. 33) |
| Defendants. | **OBJECTIONS DUE WITHIN TWENTY-ONE DAYS** |

17
18
19
20
21
22

    Pending before the Court is the partial motion to dismiss for failure to state a claim filed by Defendants California Department of Corrections and Rehabilitation ("CDCR"), Jeffrey Macomber, Kevin Hixon, Diane Toche, Connie Gipson, Frederick, Beyerlein, Ulises Ojeda, Elizabeth Beltran, and Bianca Truong.  Having considered the moving papers, as well as the Court's file, the Court issues the following findings and recommendations recommending granting in part and denying in part Defendant's partial motion to dismiss.

23

## I.

24

## BACKGROUND

25
26
27
28

    Plaintiffs Estate of Ariel Torres and Albertano Torres bring the instant wrongful death and civil rights action against CDCR and several of its employees in relation to the death of Ariel Torres ("decedent") while in CDCR custody.  In short, Plaintiffs contend that Defendants, although knowing the risk, improperly housed decedent with a cellmate serving a life sentence

for murder of a vulnerable person.  (ECF No. 28, ¶¶ 2, 48.)  Hours after being housed together, decedent was strangled to death by his cellmate.  (Id. at ¶ 5, 55.)  All of Plaintiffs' causes of action are based on those basic facts.

Plaintiff Estate of Ariel Torres brings this action through successor-in-interest and heir Albertano Torres, decedent's father, who is also individually a plaintiff to this action.  (Id. at ¶ 17.)  Defendant CDCR is a California State agency that is responsible for the operation of the California State prison and parole systems, including North Kern State Prison ("North Kern"), where decedent died.  (Id. at ¶ 18.)  Defendant Jeffrey Macomber ("Macomber") is the Secretary for CDCR, which is the highest-level official in CDCR and is responsible for administering and overseeing operations at CDCR, including management, safety, and security of CDCR inmates and staff.  (Id. at ¶ 19.)  Defendant Diana Toche ("Toche") is the Undersecretary of Health Care Services for CDCR and is responsible for the day-to-day administration of all health care services for the 33 CDCR adult prison facilities, including implementing policies, procedures, and practices relating to medical care services.  (Id. at ¶ 20.)  Defendant Connie Gipson ("Gipson") was the Director of the Division of Adult Institutions for CDCR at the time of decedent's placement and death.  (Id. at ¶ 21.)  Gipson was in charge of the day-to-day administration of all 33 CDCR adult prison facilities, including implementing policies, procedures, and practices related to operations.  (Id. at ¶ 21.)  Defendant Kevin Hixon ("Hixon") was the Acting Warden of California State Prison, North Kern, who was in charge of oversight of operations at North Kern.  (Id. at ¶ 22.)  Defendant Frederick Beyerlein ("Beyerlein") is the Health Care Chief Executive Officer for North Kern and has hiring authority for all health care staff.  (Id. at ¶ 23.)  Beyerlein was also in charge of hiring, promotion, training, and supervision of healthcare staff at North Kern.  (Id.)  Defendant Ulises Ojeda ("Ojeda") is a Watch Commander at North Kern, who was responsible for all operations and security during the time of the fatal attack on decedent.  (Id. at ¶ 25.)  Defendant Elizabeth Beltran ("Beltran") is an Officer at North Kern and was responsible for conducting security checks on the housing unit where decedent was housed on February 8, 2023.  (Id. at ¶ 26.)  Defendant Monica Narvaiz is a Sergeant at North Kern and was responsible for ensuring officers conducted security checks on

the housing unit where decedent was housed on February 8, 2023.  (Id. at ¶ 27.)[1]  Defendant Bianca Truong ("Dr. Truong") was a doctor at North Kern who assessed and evaluated decedent after his transfer into the facility.  (Id. at ¶ 28.)  Defendant Doe 1 is a clinical supervisor at CDCR who is responsible for ensuring adequate screening and testing for developmental disabilities.  (Id. at ¶ 21.)  Defendants Does 2 and 3 are a sergeant and an officer at North Kern who were responsible for the housing placement of decedent.  (Id. at ¶ 29.)  CDCR referred Does 2 and 3 to Internal Affairs based on their housing placement decision regarding decedent.  (Id.) Does 4 through 20 are additional employees at CDCR, including correctional officers, civilian staff, and medical staff.  (Id. at ¶ 30.)

When decedent was six-year-old, he suffered an injury when he fell over a six- to eight-foot stairway railing, landing headfirst on a concrete floor, which left him in a coma for more than two weeks.  (Id. at ¶ 38.)  Decedent was revived but had to have several brain surgeries throughout his lifetime.  (Id. at ¶ 38.)  For example, a shunt was placed in decedent's brain to carry fluids into his stomach to prevent further brain damage.  (Id. at ¶ 38.)  A five- to six-inch portion of decedent's skull was removed to relieve brain swelling, which required further surgery to repair the skull.  (Id. at ¶ 38.)  Plaintiffs assert these surgeries resulted in decedent's fragility and a large visible scar.  (Id. at ¶ 38.)  Decedent had to relearn to walk, talk, and eat.  (Id. at ¶ 38.)  Throughout much of decedent's schooling, he was in special education and suffered from seizures.  (Id. at ¶ 38.)  As an adult, decedent was of small stature at five foot, four inches tall. (Id. at ¶¶ 3, 41.)  Decedent wore thick prescription eyeglasses and was cross-eyed.  (Id. at ¶ 40.)

Prior to his first and only conviction, decedent "never lived outside of his parents' home" because of "his inability to protect himself in light of physical and cognitive impairments."  (Id. at ¶¶ 2, 42.)  On September 22, 2022, decedent pleaded guilty to two counts of possession of child or youth pornography, Cal. Penal Code § 311.11(a).  (ECF No. 33-1, San Mateo Superior Court, Felony Abstract of Judgment, Exhibit A, pp. 4-6.)[2]  Before sentencing, decedent was

---

[1] Defendant Narvaiz is represented by separate counsel and did not join the instant motion to dismiss.  (See ECF No. 33.)

[2] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

given a psychological assessment, which indicated that "[i]f [decedent] were sent to state prison, he would be a helpless victim to other inmates[;] . . . [decedent] can easily be killed if he is struck in the head or body." (ECF No. 28, ¶ 39.) The probation report also referred to decedent's special education history and childhood brain injury. (Id. at ¶ 39.) On December 2, 2022, decedent was sentenced to two-years of imprisonment. (ECF No. 33-1, San Mateo Superior Court, Felony Abstract of Judgment, Exhibit A, pp. 4-6.) Before being transferred, a doctor at San Mateo County Jail assessed decedent, observing that he had "'loose association' thought processes, had two or three instances of 'loose' thought processes 'likely related to [traumatic brain injury],' and was 'unable to clarify connection between question and response." (ECF No. 28, ¶ 43.)

On or around January 9, 2023, decedent was transferred to North Kern to serve out his sentence. (ECF No. 28, ¶¶ 2, 55.) Decedent reported to North Kern officials that he had suffered a traumatic brain injury at age six. (Id. at ¶ 3.) In addition to decedent's large scar on his head, he was "small and weak, lacked social skills, required accommodations regarding his physical mobility, had requested and been granted placement in a 'Sensitive Needs Yard,' and did not respond to questions appropriately." (Id. at ¶¶ 3 40, 44.) Decedent moved slowly and was noticeably deliberate in his gait. (Id. at ¶ 40.) Decedent took a significantly long time to learn, and his affect was of an adolescent. (Id. at ¶ 40.) For example, decedent laughed at inappropriate times or when he was uncomfortable. (Id. at ¶ 42.) Decedent did not respond in socially normative ways to serious questions, giving responses that were off topic or evasive. (Id. at ¶ 42.) Decedent was solicitous, smiley, and helpful—even with people who would not welcome help or would be hostile. (Id. at ¶ 42.) Decedent also found it difficult to say "no," which led to people taking advantage of him. (Id. at ¶ 42.)

When decedent arrived at North Kern, someone[3] administered an initial cognitive test, and decedent received a passing score, meaning he was not identified as having a developmental disability or referred to the Developmental Disability Program ("DDP"). (Id. at ¶ 56.) Plaintiffs

---

[3] Plaintiffs do not identify this person or theorize who it may have been. (See ECF No. 38, p. 11.)

allege that the test "is an outdated test that does not adequately identify prisoners with cognitive deficits." (Id.)  In addition, at some point in January 2023, decedent was placed in an upper bunk for several days, despite having been recommended for a lower bunk.  (Id. at ¶ 63.)  On January 28, 2023, Dr. Truong evaluated decedent in-person, conducting an initial diagnostic screening.  (Id. at ¶ 43.)  Decedent advised Dr. Truong that he had an extensive medical history relating to a head injury.  (Id. at ¶ 56.)  In addition, CDCR had the county jail medical records for decedent that confirmed his head injury.  (Id.)  Plaintiffs allege that "[u]pon information and belief, [Dr.] Truong either failed to review those records or disregarded them."  (Id.)  Dr. Truong did not refer decedent to DDP and noted that decedent had "normal gait and movements."  (Id.)  Notwithstanding, Dr. Truong recommended that decedent receive a lower bunk and placement in a lower tier. (Id. at ¶¶ 43, 56.)  Decedent was given a placement score of 19 and security level 2.  (Id. at ¶ 45.)[4]  Plaintiffs allege that Dr. Truong's oversights and recommendations led decedent to be housed with a violent inmate, as well as denying decedent critical accommodations for his disabilities including modifications to housing procedures.  (Id. at ¶ 56.)  Prior to receiving a cellmate, decedent spent several days alone in his cell.  (Id. at ¶¶ 4, 68.)  During that time, prison staff did not address decedent's cognitive or physical disabilities and impairments.  (Id. at ¶ 68.)

On February 8, 2023, inmate Matthew Holverstott ("Holverstott") met with a committee that cleared him to for double-cell housing.  (Id. at ¶¶ 2, 5, 51.)  Holverstott opposed to being double-celled, and according to Plaintiffs, Holverstott "vowed to himself that he would assault whoever his cellmate ended up being."  (Id. at ¶ 5; see id. at ¶¶ 2, 46, 51.)  Despite this, Holverstott was assigned to be housed with decedent that same day.  (Id. at ¶¶ 2, 5, 51.)

In addition of a history of other violence, Holverstott had been convicted of a "particularly violent" murder of a vulnerable elder, his father, age 73, and sentenced to life in prison.  (Id. at ¶¶ 2, 48.)  Holverstott's probation report noted that Holverstott had a prior felony arrest from April 2020 after "he [had] used his elbow to smash the driver's side window during a road rage incident, causing injury to the driver."  (Id. at ¶ 49.)  In addition, the probation report

---

[4] Plaintiffs do not allege the definitions or meaning of a "placement score" or "security level."

noted that in June 2022, while in county jail, Holverstott "was told he would be moving units. He stated he would not move and if taken out of his room, he would go cell to cell and 'kill everyone.'  He received three days restriction."  (Id. at ¶ 50.)  Holverstott was on the mental health caseload, as part of "the Enhanced Outpatient Program."  (Id. at ¶ 52.)  Holverstott was given a placement score of 42 and security level 3.  (Id.)

Plaintiffs allege that it was Does 2 and 3, a sergeant and an officer, who assigned decedent to a cell with Holverstott.  (Id. at ¶ 55.)  Within hours of being housed together, Holverstott strangled decedent.  (Id. at ¶¶ 5, 69.)  Soon thereafter, decedent was found unresponsive in the cell and medical care was attempted to be administered.  (Id. at ¶¶ 5, 73.)  However, decedent was declared deceased at approximately 9:41 p.m.  (Id. at ¶¶ 5, 73.)  Records indicated that decedent had sustained numerous injuries as a result of the attack, including injuries to the knee, nose, eyes, forehead, mouth, neck, chin knuckle, elbow, thumb, and hand.  (Id. at ¶ 72.)  Blood was found at the scene of the attack.  (Id.)

Holverstott stated that decedent's social skills deficits were a factor in his violent attack.  (Id. at ¶ 5.)  Subsequently, Holverstott also claimed that decedent had been assisting Holverstott with his property and that Holverstott had perceived decedent's gestures to be threatening, which gave him the motivation to assault and kill decedent.  (Id. at ¶ 70.)  Holverstott reported that he had used a "rear naked chokehold" when subduing decedent.  (Id. at ¶ 71.)  Holverstott stated that decedent had fought back, and staff observed that Holverstott had reddened areas on his back and shin.  (Id.)

For context, Plaintiffs cite to three prisoner class actions that are all in the remedial phase:  Clark v. California, No. 3:96-cv-1486-CRB (N.D. Cal.); Armstrong v. Newsome, No. 4:94-cv-2307-CW (N.D. Cal); and Coleman v. Newsom, No. 2:90-cv-520-KJM-SCR (E.D. Cal.).  According to Plaintiffs, these lawsuits resulted in the Clark Remedial Plan, as well as putting CDCR on notice for years about protections and accommodations for prisoners and for mental health treatment for prisoners.  (ECF No. 28, ¶¶ 8, 10, 11, 54.)  Plaintiffs state that Defendants did not follow the Clark Remedial Plan, "including placement into a designed DDP area for inmates with a disability and victimization concerns, concerns about vulnerability,

and/or 'a need for more intensive supervision and intervention.'"  (Id. at ¶ 65.)  Plaintiffs assert that failure to "follow procedures" resulted in Holverstott being placed with decedent and ultimately the death of decedent.  (Id. at ¶ 66.)

Plaintiffs allege that "North Kern officials failed to follow procedures designed to prevent pairing such inmates together in a cell and designed to protect vulnerable inmate with the kinds of impairment affecting [decedent]," in violation of Cal. Code Regs. tit. 15 § 3375.2 and the Clark Remedial Plan.  (Id. at ¶¶ 53, 47, 48, 62; see id. at ¶¶ 7, 57.)[5]  Following an Internal Affairs investigation, "CDCR disciplined an officer [Doe 3] and a sergeant [Doe 2]" because "they had violated policy regarding the housing placement decision."   (Id. at ¶ 5; see id. at ¶ 9.)  Specifically, the Office of the Inspector General's report stated that:

> Sergeant [Doe 2] and an officer [Doe 3] allegedly failed to consider all relevant case factors when requesting and approving a bed move for [Holverstott].  Thereafter, [Holverstott] killed his cellmate.  . . . [CDCR] sustained the allegation and imposed a 5 percent salary reduction for nine months for the sergeant and issued [corrective action] for the officer.

(Id. at ¶ 55; see id. at ¶ 9.)

Plaintiffs state that housing assignments at North Kern for new arrivals should have included considerations of all relevant case factors to assess whether an immediate risk or safety concern existed, including developmental or cognitive impairment, length of incarceration terms, height and weight.  (Id. at ¶ 58.)  Prisoners of different security levels, prisoners assigned and not assigned to the Sensitive Needs Yard, and prisoners on and not on the mental health caseload were usually not housed together.  (Id. at ¶¶ 59-61.)  However, "Defendants nonetheless allowed [decedent] and . . . Holverstott, whose security classifications differed, to be housed together, and/or failed to prevent such housing placement from occurring."  (Id. at ¶ 59.)  Moreover, "[t]he computerized system used for housing prisoners would have or should have alerted staff to the various factors that made [decedent] and . . . [Holverstott] incompatible as cellmates."  (Id. at ¶ 64.)

---

[5] Plaintiffs also rely on Cal. Gov. Code § 11349.3, which appears to be immaterial to this matter.  (ECF No. 28, ¶ 57.)

Plaintiffs allege that Hixon, Warden at North Kern, and Beyerlein, CEO of North Kern, were "responsible for ensuring that his subordinates follow the proper procedure for placing an inmate in the cell of another inmate. (Id. at ¶ 62; see id. at ¶ 67.)  However, Hixon failed to do so because he "effectively 'rubber-stamped' a deeply flawed process that . . . he knew or reasonably should have known would lead to dangerous conditions for inmates in the situation faced by [decedent]." (Id. at ¶ 62.)  Plaintiffs state that Hixon "permitted Does 2 and 3, and supervisory staff, to not follow the proper administrative procedure for placing one inmate in the cell of another inmate," despite the threat Holverstott posed to anyone with whom he would be housed. (Id.)  Moreover, Hixon and Beyerlein did not implement Armstrong,[6] Coleman, or Clark, despite their alleged knowledge of those cases. (Id. at ¶ 67; see id. at ¶¶ 80, 81.)

In addition to decedent's death, three other prisoner-on-prisoner homicides occurred at North Kern in 2023, including a similar incident within weeks of decedent's death. (Id. at ¶¶ 11, 76, 77.)  Another North Kern prisoner was killed by his cellmate days after the victim's sentencing. (Id. at ¶ 78.)  In the year leading up to decedent's death, North Kern had an average of 18 incidents a month involving battery on an inmate. (Id. at ¶ 79.)  Plaintiffs allege that the "consistent pattern of attacks . . . highlights the flawed procedures for preventing inmates, including [decedent], from being harmed by their cellmate." (Id. at ¶ 75.)  One such incident at North Kern was between two neighboring prisoners that involved a shank during medication distribution. (Id.)  Another incident occurred in the same month as decedent's death where two inmates attacked another inmate, stabbing him 13 times before staff intervened. (Id.)  For even broader context, Plaintiffs allege that between 2019 and 2021, "at least five homicides of other inmates with disabilities at another facility" occurred. (Id. at ¶ 12.)

On July 19, 2023, the California State Government Claims Program ("GCP") received a

---

[6] Plaintiffs include in their amended complaint excerpts from expert reports filed in Armstrong that discussed the treatment of disabled people at the Substance Abuse Treatment Facility and State Prison – Corcoran. (ECF No. 28, ¶¶ 82-85); see Armstrong v. Newsom, No. 4:94-cv-02307-CW, Court Expert Report, ECF No. 3446 (N.D. Cal. Dec. 20, 2022).  Plaintiffs offer no basis for the Court to take notice or incorporate an expert report regarding an institution that is not a party to this matter.  Nor have Plaintiffs made a clear connection between any relief in Armstrong and direct, required action at North Kern.  The Court cites to the expert report here for completeness of the amended complaint and will discuss whether these records should be subject to judicial notice or incorporation below.  The Court allows for the remaining inferences Plaintiffs suggest regarding Armstrong generally.  See Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).

California Government Claim form from counsel for decedent Ariel Torres with the requisite filing fee.  (ECF No. 33-1, Government Claim Form, Exhibit C, p. 91; see ECF No 28, ¶ 36.)  The form listed Ariel Torres as the claimant with the address of counsel for purposes of notice and communications.  (ECF No. 33-1, pp. 96-97.)  The form included a detailed description of the date, place, and circumstances surrounding the death of decedent.  (Id. at pp. 97-99.)  For specific damage, the form stated: "[decedent] died as a result of gross negligence by CDCR or its agents/employees."  (Id. at p. 91.)  The form concluded with listing damages in excess of $10,000.  (Id. at p. 99.)  On March 6, 2024, the GCP rejected the claim as too complex and "beyond the scope of legal representation usually undertaken by GCP."  (ECF No. 38-1, p. 1.)

Thereafter, Plaintiffs timely commenced this action on June 21, 20204.  (ECF No. 1.)  On September 13, 2024, Plaintiffs filed their amended complaint, bringing nine causes of action: 1) Deliberate Indifference to Serious Medical Needs; 2) Conditions of Confinement; 3) Failure to Protect; 4) Supervisory Liability; 5) Loss of Familial Relations; 6) violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and California Government Code Section 11135; 7) Negligent Supervision, Training, and Staffing; 8) Wrongful Death; and 9) Negligence – Survival Action.  (ECF No. 28, pp. 30-49.)  On September 27, 2024, all defendants, except Monica Narvaiz, filed the instant partial motion to dismiss.  (ECF No. 33.)[7]  The District Court referred the motion to the undersigned.  (ECF No. 34.)  The motion was fully briefed (ECF Nos. 38, 40), and the Court heard argument on November 6, 2024.  (ECF No. 46.)

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving

---

[7] The motion does not seek dismissal of all claims against Defendants Beltran and Ojeda.  Defendants do not seek dismissal of the conditions of confinement claim, the failure to protect claim, and the loss of familial relations claims against Ojeda and Beltran, as well as supervisory liability against Ojeda.  (ECF No. 33, p. 9 n.1.)

party." Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996). The pleading standard under Rule 8 does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true. Id. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. To avoid a dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

In deciding whether a complaint states a claim, the Ninth Circuit has discussed that two principles apply. First, to be entitled to the presumption of truth the allegations in the complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief. Id. "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988)).

### III.

### DISCUSSION

#### A. Judicial Notice

Along with their motion to dismiss, Defendants move for judicial notice and incorporation-by-reference of certain documents. (ECF No. 33-2, pp. 1-7.) Plaintiffs did not oppose and attached two of their own documents to their opposition. (ECF No. 38-1, pp. 1-2.) In the reply, Defendants did not oppose notice or incorporation Plaintiffs' documents. (See ECF No. 40.)

"As a general rule, 'a district court may not consider any material beyond the pleadings in

ruling on a Rule 12(b)(6) motion.'"  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (quoting Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994)).  Doing so would convert a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d).  However, a court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).  Courts may also take judicial notice of undisputed matters of public record, Lee, 250 F.3d at 689, including documents filed in federal or state courts.  Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012).

"Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee, 250 F.3d at 688 (cleaned up).

Defendants ask that the Court take notice or incorporate the following documents: 1) an Abstract and Judgement from San Mateo County Superior Court reflecting that decedent was convicted of possession of child or youth pornography and sentenced to two years of imprisonment; 2) the Clark Remedial Plan; 3) California Code of Regulations, Sections 3269, 3375.1(a), and 3376; 4) the California Government Claims Form No. CGP202304835 filed on behalf of decedent; 5) a Declaration from the California Government Claims Unit indicating that there are no records found for Albertano Torres; 6) the website of CDCR; and 7) expert reports from Armstrong v. Newsom, No. 4:94-cv-02307, ECF Nos. 3446, 3500 (N.D Cal.).  (ECF No. 33-2.)

The Court takes judicial notice of the following:  the judgment form San Mateo Superior Court (ECF No. 33-1, pp. 4-6); the Clark Remedial Plan (Id. at pp. 8-87); the California Code of Regulations; and the declaration from the California Government Claims Unit regarding no records found.  (Id. at p. 90.)  The judgment, remedial plan, and regulations are undisputed

1   matters of public record, and judgment and remedial plan are both documents filed in state or

2   federal courts.  The Court takes judicial notice of the declaration from the Government Claims

3   Unit because it is a fact that is capable of accurate and ready determination from a source whose

4   accuracy cannot reasonably be questioned, which here is the California Department of General

5   Services, Government Claims Program.  (Id. at p. 106.)

6       The Court incorporates into the amended complaint the California Government Claims

7   form filed on behalf of decedent.  (Id. at pp. 91-104.)  The filing and contents of this form are

8   statutory requirements for Plaintiffs to bring their state law claims of negligent supervision,

9   wrongful death, and a survival action.  In other words, this document forms the jurisdictional

10  basis of these claims.  Plaintiffs do not question the authenticity of the form.  (See ECF No. 38,

11  p. 30 n.9.)

12      The Court declines to take judicial notice or incorporate the website for CDCR as well as

13  the expert reports filed in Armstrong.  (Id. at pp. 108-94.)  Defendants state that the CDCR

14  website allows the Court to take notice that North Kern is a "reception center."  Plaintiffs have

15  not put this at issue, and Court finds that it is irrelevant at this time to the arguments at issue.

16  The Court declines to take notice or incorporate the expert reports filed in Armstrong.  While

17  these are court filings, the Court finds that that are ultimately irrelevant on their face to

18  Defendants' motion.  Indeed, Defendants apparently seek notice or incorporation so that the

19  Court might disregard the reports as irrelevant.  (See ECF No. 33-2, p. 6.)

20      With the opposition, Plaintiffs attached a March 6, 2024 letter from the California

21  Department of General Services informing counsel that decedent's claim had been denied.  (ECF

22  No. 38-1, pp. 1-2.)  The Court takes judicial notice of this letter because it is a fact that is capable

23  of accurate and ready determination from sources whose accuracy cannot reasonably be

24  questioned, which here is the California Department of General Services, Government Claims

25  Program.  (Id.)

26      Finally, Plaintiffs have attached a series of emails between attorney Aaron Zisser and the

27  CDCR North Kern Litigation Coordinator.  (ECF No 38-2.)  The Court declines to take judicial

28  notice or incorporation of these emails.  These emails do not contain facts that are capable of

1  accurate and ready determination from sources whose accuracy cannot reasonably be questioned.

2  **B.  Claims Brought Through 42 U.S.C. § 1983[8]**

3  **1.  Deliberate Indifference to Serious Medical Needs**

4      Defendants begin by arguing that Plaintiffs have failed to state a claim of deliberate
5  indifference to serious medical needs as to Dr. Trong because the allegations do not rise to the
6  level of deliberate indifference.  (ECF No. 33, pp. 15-16.)   Defendants then contend that
7  Plaintiffs failed to state a claim as to Defendants Macomber, Toche, Gipson, Hixon, and
8  Beyerlein because Plaintiff failed to allege that any of these Defendants had any personal
9  involvement with decedent's disabilities or medical care.  (Id. at pp. 16-18.)  Plaintiffs respond
10  that Dr. Truong failed diagnose or refer decedent based on his serious medical need and this
11  decision "was essential information for those decisionmakers regarding [decedent's] housing
12  placement.  (ECF No. 38, pp. 11-15.)  For the remaining Defendants, Plaintiffs argue that these
13  Defendants were responsible for policy-level failures regarding decedent's medical care.  (Id. at
14  p. 15-19.)  Defendants are correct.

15      While the Eighth Amendment of the United States Constitution entitles an inmate to
16  medical care, the Eighth Amendment is violated only when a prison official subjectively acts
17  with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d
18  978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076,
19  1082-83 (9th Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Under the
20  subjective deliberate indifference standard, "a prison official will be liable for disregarding an
21  inmate's serious medical needs only if he was both 'aware of facts from which the inference
22  could be drawn that a substantial risk of serious harm exists' and actually 'dr[e]w the inference.'
23  Sandoval v. Cnty. of San Diego, 985 F.3d 657, 667-68 (9th Cir. 2021) (quoting Peralta, 744 F.3d
24  at 1086).  In contrast, "a prison official who 'should have been aware' of a medically related risk
25  to an inmate, but in fact was not, 'has not violated the Eighth Amendment, no matter how severe
26  the risk.'"  Id. at 668 (quoting Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002)),

27

28  [8] The Court declines Defendants' invitation to consider whether qualified immunity would apply at this early stage
of the litigation.

overruled on other grounds, Castro v. Cnty. of Los Angeles, 833 F.3d 1060 (9th Cir 2016)). Mere negligence is insufficient for Eighth Amendment liability.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

"A medical need is serious if failure to treat it will result in significant injury or the unnecessary and wanton infliction of pain."  Peralta, 744 F.3d at 1081 (citation and internal quotation marks omitted).  "Indications that a plaintiff has a serious medical need include [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation omitted).

A prison official's failure to provide accommodations for a disabled inmate may constitute deliberate indifference to the inmate's safety in violation of the Eighth Amendment. Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998); see also La Faut v. Smith, 834 F.2d 389, 393 (4th Cir. 1987) (prison officials ignored the basic needs of a handicapped individual and postponed addressing those needs out of mere convenience or apathy); Johnson v. Hardin Cnty., Kentucky, 908 F.2d 1280, 1284 (6th Cir. 1990) (denial of crutches and other accommodations for those who are mobility-impaired); Casey v. Lewis, 834 F. Supp. 1569, 1580 (D. Ariz.1993) (physical accommodations necessary because of disabilities); Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998) (allegations that officials denied accommodation where a leg brace was required for walking). In Frost, La Faut, Bradley, and Casey, the courts characterized the plaintiffs' accommodation claims as a conditions of confinement issue.  In Johnson, the court evaluated the plaintiff's accommodation claim as an inadequate medical care issue.  In any event, issues of inhumane conditions of confinement, failure to attend to medical needs, failure to provide for an inmate's safety, or some combination thereof, are appropriately scrutinized under the "deliberate indifference" standard.  See Whitely v. Albers, 475 U.S. 312, 319 (1986).

a.  Defendant Dr. Truong

For purposes of the motion to dismiss, the Court accepts as true Plaintiffs' allegations that Dr. Truong failed to identify decedent's full developmental disability and physical

vulnerabilities despite having access to the CDCR county jail records.   Notwithstanding, the remaining allegations in the amended complaint fail to satisfy the objective and subjective components of the deliberate indifference standard.

The crux of the parties' dispute centers around the framing and scope of deliberate indifference and the actions of Dr. Truong.  With that, Plaintiffs must allege that Dr. Truong was aware of facts from which the inference could be drawn that by not diagnosing decedent with a developmental disability (mental and physical) and/or referring him to the DDP, there existed a substantial risk of serious harm.   See Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).  Further, Dr. Truong must have drawn that inference and disregarded it.   Id.

Plaintiffs assert that this is demonstrated by the allegations that decedent advised Dr. Truong that he had a head injury from falling over a stairway at age six, he received nearly 40 surgeries and had sustained damage to his eyes, and he had a shunt in his neck to this stomach. (ECF No. 38, p. 12, citing ECF No. 28, ¶ 56.)  Plaintiffs further assert that CDCR had decedent's county jail records (and Dr. Truong had access), which included noting decedent's history of special education and that decedent had experienced "loose association" thought process "likely related to TBI."  (Id.)  Plaintiffs also cite to decedent's "obvious signs of physical impairment and medical fragility."  (Id., citing ECF No. 28, ¶ 97.)  That said, Plaintiffs allege that Dr. Truong recognized that decedent had "some vulnerability and recommended that [decedent] receive a lower bunk and placement in a lower tier."  (Id. at ¶ 56.)

The Court finds that these allegations do not demonstrate that Dr. Truong's failure to diagnose or refer during an "initial diagnostic screening" of decedent would lead to a substantial risk of serious harm.  (ECF No. 28, ¶ 56.)  The Court assumes that there might be some risk that decedent would not get all the initial medical care or resources he might need, but this does not create an inference that a substantial risk of serious harm would befall decedent.  Additionally, while there might have been some harm in housing decedent in a double cell, it is too far of a logical leap based on the facts alleged to infer that double-celling, in and of itself, posed a substantial risk of serious harm to decedent.   Though county jail records contained a psychological assessment that indicated that were decedent sent to state prison, he would be a

helpless victim to other inmates (ECF No. 28, ¶ 39), that record did not contain an explicit recommendation for or against double-celling for Dr. Truong to review.   Even liberally construing the county jail psychological assessment as a medical recommendation regarding housing, at best, this would be a difference of opinion between the assessment and Dr. Truong's screening—at worst, negligence.   Neither of which can support a claim of deliberate indifference.  Toguchi, 391 F.3d at 1060.

Further, even assuming that Dr. Truong's failure to diagnose decedent or refer him to DDP did pose a serious medical need with a substantial risk of serious harm, Plaintiffs fail to allege that Dr. Truong knew of facts that could lead to an inference that decedent would be double celled and thereby likely to sustain an attack and consciously disregarded those facts. This is perhaps fatal this this claim.  The Court takes Plaintiffs position to be a logic chain that attempts to extend Dr. Truong's initial diagnostic screening directly to the actions of Does 2 and 3—the individuals who made the housing decision regarding decedent.  This is too attenuated. There are no facts alleged that demonstrate that Dr. Truong knew her initial diagnostic screening would be used for a housing assignment and if it were, how it would be used in that assignment. Moreover, there are no allegations that Dr. Truong knew that her screening would lead to double-celling, that double-celling was a medical decision, and that double-celling itself posed a substantial risk of serious harm to decedent.   There are no allegations Dr. Truong's recommendation on housing was required to be followed by the other individuals who were actually in charge of the housing placement.  Plaintiffs' suggestion that Dr. Truong should have known that her failure to diagnose decedent's developmental disability or refer him to DDP would lead to double-celling (ECF No. 38, p. 14), and foreseeably decedent's death, is not enough to state a claim of deliberate indifference.  Sandoval, 985 F.3d at 667-68; Gorton v. Todd, 793 F. Supp. 2d 1171, 1177 (E.D. Cal. 2011) (citing Toguchi, 391 F.3d at 1057).

Plaintiffs' cited precedent is not persuasive.  In Norsworthy v. Beard, the district court, in deciding a preliminary injunction, observed that the plaintiff, an inmate, was a transwoman who was experiencing gender dysphoria.  87 F. Supp. 3d 1164, 1169-70 (N.D. Cal. 2015).  At that time, CDCR's position, derived from a statute, was that sex reassignment surgery for gender

1   dysphoria was "not medically necessary" and "shall not be provided." Id. at 1176.  In order to

2   alleviate the psychological and emotional pain of her gender dysphoria, the plaintiff sought

3   hormone therapy as well as sex reassignment surgery.  Id.  at 1169-70.  The plaintiff received

4   some care, including hormone therapy and psychotherapy that lasted years.  Id. at 1172.

5   However, the plaintiff was still experiencing excruciating pain and frustration as a result of her

6   gender dysphoria and her treating psychologist opined that sex reassignment surgery was a

7   "clinical medical necessity. . . ." Id.  Due to other medical complications, the plaintiff needed to

8   withdraw from hormone therapy, and CDCR initially denied the plaintiff alternative medication

9   to treat her gender dysphoria.  Id. at 1173.  Three months later, the plaintiff was allowed to have

10  a reduced hormone therapy rather than the recommended transdermal or injected preparations.

11  Id.  The district court then discussed that the plaintiff had been on a path to sex reassignment

12  surgery as far back as 2012, including going through two levels of an administrative appeal.  Id.

13  at 1174.  As relevant here, the district court found that the plaintiff's gender dysphoria evidenced

14  a serious medical need.  Id. at 1189.  The court then cited the plaintiff's administrative appeal

15  and an accessible set of medical guidelines as demonstrating that the defendants had known of

16  the plaintiff's serious medical need as well as the harm that might result from not allowing a sex

17  reassignment surgery.  Id.  In addition, the court noted that it had been apparent that the

18  defendants had ignored the recommendations of the plaintiff's treating mental health provider.

19  Id. at 1190.  The court concluded that the plaintiff would be likely successful in her claim of

20  deliberate indifference to a serious medical need because the evidence demonstrated that the only

21  adequate medical treatment for the plaintiff was sex reassignment surgery, notwithstanding

22  CDCR's position.  Id. at 1191-92.  The court then cited Toguchi for the proposition that "on a

23  claim involving choices between alternative courses of treatment, a prisoner must show that the

24  chosen course of treatment was medically unacceptable under the circumstances, and was chosen

25  in conscious disregard of an excessive risk to [the prisoner's] health." Id. at 1192 (quoting

26  Toguchi, 391 F.3d at 1058).

27       While caselaw in this area of the law is highly fact specific and usually requires

28  analogies, Norsworthy is of no help to Plaintiffs.  Looking past the procedural posture in

1  Norsworthy that allowed that court to review evidence, it is clear that the entire context is

2  different from the instant case.  Significantly, the deliberate indifference claim in Norsworthy

3  boiled down to a claim involving alternative courses of treatment.  Id.  In any event, Plaintiffs

4  assert that this case demonstrates that when a defendant offers some medical treatment, it may

5  still not be constitutionally adequate.  (ECF No. 38, p. 14.)  While this may be true, and in the

6  case of Norsworthy it was, the same can hardly be said here.  Indeed, in Norsworthy the

7  defendants unequivocally knew, through an appeal and accessible medical guidelines, of the

8  plaintiff's serious medical need and that it caused psychological and emotional pain on a daily

9  basis; the plaintiff was seeing a treating mental health psychologist who made a formal diagnosis

10 of gender dysphoria and gave a medical opinion that sex reassignment surgery was necessary;

11 and outside expert evidence demonstrated that sex reassignment surgery can be necessary in

12 certain contexts.  Here, Dr. Truong allegedly reviewed county jail records that indicated that

13 decedent might be a victim to other inmates in the State prison system.  The county jail

14 assessment did not include a medical diagnosis or a recommendation on the type of housing

15 placement decedent medically required.  Moreover, neither the county jail records, nor

16 decedent's reporting indicated the type or intensity of injury he was or would sustain by not

17 being diagnosed with a developmental disability, by not being referred to DDP, or by not being

18 housed in a single cell.  Even with the Court assuming that decedent suffered from a serious

19 medical need and that there were facts that allow for an inference that decedent might experience

20 serious harm, there are no allegations that demonstrate that Dr. Truong consciously disregarded

21 facts that would allow for an inference that her screening would put into motion that decedent

22 would be double celled with an inmate who would later strangle him.[9]

23 / / /

---

[9] Plaintiffs only other relevant precedent cited is inapposite.  In Brown v. Plata, the Supreme Court of the United States affirmed an order from a three-judge panel that required the California State prison system to reduce its population in order to comply with the strictures of the Eighth Amendment.  563 U.S. 493 (2011).  In recounting the factual record, the Court noted, in the context of prison "[c]rowding," that "[t]wo prisoners committed suicide by hanging after being placed in cells that had been identified as requiring a simple fix to remove attachment points that could support a noose."  Id. at 520.  While the Court discussed elsewhere that suicide in prison was included under the umbrella of serious mental illness, id. at 503-04, the Court did not cite to or opine that housing two suicidal inmates together was "an example of inadequate medical care."  (ECF No. 38, p. 15.)  Thus, Plaintiffs' reliance on Plata is misplaced.

b.  Defendants Macomber, Toche, Gipson, Hixon, and Beyerlein

Defendants argue that Plaintiffs do not allege facts demonstrating that Defendants Macomber, Toche, Gipson, Hixon, and Beyerlein knew of and disregarded an excessive risk to decedent's health and safety.  (ECF No. 33, pp. 16-18.)  Plaintiffs respond that "[t]he potential lack of personal involvement in [decedent's] medical care does not absolve a defendant from liability" from a claim of deliberate indifference to a serious medical need.  (ECF No. 38, p. 15.) Instead, Plaintiffs clarify in their opposition that there was a purported "policy-level failure" by these Defendants.  (Id.)  It appears that Plaintiffs are overlaying a claim for supervisory liability on a claim for deliberate indifference to a serious medical need.  In any event, Defendants are correct.

Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of *respondeat superior*.  Iqbal, 556 U.S. at 676-77; Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); accord Starr, 652 F.3d at 1205-06; Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).  "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."  Corales, 567 F.3d at 570 (internal quotation omitted). Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy 'itself is a repudiation of the constitutional rights' and is 'the moving force of the constitutional violation.'"  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)).

The allegations Plaintiffs cite as supporting their supervisory liability policy claim are as follows.  The CDCR administrators and supervisors were responsible for ensuring the adequate protection from harm to prisoners at North Kern.  (ECF No. 28, ¶ 8.)  Administrators were regularly provided and or informed of the statewide class actions of Armstrong and Coleman. (Id. at ¶ 10.)  Decedent's death followed a spate of "at least five homicides of other inmates with

disabilities at another facility between 2019 and 2021 . . . ."  (Id. at ¶ 12.)  Plaintiffs allege that Macomber, Secretary of CDCR, was responsible for administering and overseeing operations at CDCR, including the implementation of polices and procedures are CDCR.  (Id. at ¶ 19.) Plaintiffs allege that Macomber was "regularly provided with reports and complaints" concerning prisoners with cognitive disabilities, improper classification of prisoners in prisons, prisoner deaths, prisoner-on-prisoner attacks, and other violations involving housing, safety, care, medical care, and treatment of prisoners.  (Id.)  Additionally, Macomber was provided with the findings and orders of Armstrong, Coleman, and the Clark remedial plan.  (Id.)  Plaintiffs state that Macomber's failure to ensure enforcement or implementation of policies set in motion a series of actions that that Macomber knew or should have known would harm someone like decedent—in other words placing decedent "into a cell with a violent inmate."  (Id.)  By and large, the allegations are the same for Defendants Toche, Gipson, Hixon, and Beyerlein.  (Id. at ¶¶ 20-23, 98-103; see id. at ¶¶ 62, 67, 90, 91, 93-95.)

Plaintiffs also allege that "CDCR supervisory Defendants had been on notice for years that their provision of safety and disability screening and accommodations to prisoners at North Kern was inadequate and resulted in needless harm and death to inmates, particularly inmate with disabilities or other vulnerabilities."  (Id. at ¶ 54.)  Plaintiffs state that the "issue of protection from harm through adequate mental health treatment for inmates with disabilities throughout the CDCR system is in active litigation," and Plaintiffs cite to an expert report in Armstrong.  (Id. at ¶ 80; see id. at ¶¶ 82-85.)  Plaintiffs note that "[s]uch medical treatment and care include[s] identifying disabilities and other physical or mental vulnerabilities . . . that make them susceptible to harm by other inmates and ensuring the provision of appropriate supports and accommodations."  (Id. at ¶ 92.)

The Court finds that Plaintiffs have not alleged a policy that is so deficient that it is a repudiation of the constitutional right as well as the moving force of deliberate indifference to a serious medical need.  In other words, Plaintiffs have not alleged that a policy at North Kern in conducting an intake screening repudiates the right to adequate medical treatment.  Plaintiffs have identified a policy in the broadest sense, but they have not alleged the mechanics of how the

1  policy was or was not implemented and how the policy fails to address serious medical needs for

2  people with disabilities.  For instance, Plaintiffs have not alleged that the intake screening was

3  the <u>only</u> instance at North Kern when an inmate might be identified as disabled.  Plaintiffs have

4  not alleged that there was policy or custom at North Kern that disabled people would usually be

5  housed in a single cell (or double celled).  Significantly, Plaintiffs have not alleged that any

6  policy at North Kern requires or fails to require that an intake screening include a

7  recommendation about housing and whether that recommendation is akin to medical care or

8  treatment.

9       In addition, Plaintiffs have not alleged sufficient facts to demonstrate that by North Kern

10  having a policy that fails to diagnose decedent (or someone similar to decedent) with a

11  developmental disability in an intake screening that such failure was a moving force in housing

12  determinations and housing assignments—the proximate actions that would lead to the death of

13  decedent.  Again, Plaintiffs have not alleged that double celling creates a substantial risk of harm

14  for a developmentally disabled person.   Plaintiffs have not alleged that people with

15  developmental disabilities at North Kern are only, or only should be, assigned to single cells.

16  Creating further attenuation, Plaintiffs seemingly agree that real evil in this case was that

17  decedent was "placed into a cell with a violent inmate."  (ECF No. 38, p. 16, quoting ECF No.

18  28, ¶¶ 19-23, 85.)

19       Accordingly, the Court will recommend granting Defendants' motion to dismiss as to Dr.

20  Truong and Defendants Macomber, Toche, Gipson, Hixon, and Beyerlein on the claim for

21  deliberate indifference to a serious medical need.[10]  However, in light of the foregoing, the Court

22  will recommend Plaintiffs be given leave to amend.

23       **2.  Conditions of Confinement, Failure to Protect, and Loss of Familial Relations**

24       Defendants argue that because the legal standard for Plaintiffs' claims of conditions of

25  confinement, failure to protect, and loss of familial relations is deliberate indifference, these

26

27  [10] The Court recommends granting leave to amend with the understanding that Plaintiffs will do so only to the extent they believe in good faith they can plead additional factual material that could satisfy the legal standards and deficiencies identified above and not merely parrot this Order.  <u>See</u> Fed. R. Civ. P. 15(a)(2); <u>Lopez v. Smith</u>, 203

28  F.3d 1122, 1130 (9th Cir. 2000).

claims fail largely for the same reasons Plaintiffs' claim of deliberate indifference to a serious medical need.  (ECF No. 33, p. 19.)  Plaintiffs begin by responding with largely the same policy-based argument underlying their deliberate indifference to a serious medical need argument, this time including a discussion on Armstrong, Clark, and Coleman.  (ECF No. 38, pp. 20-23.) Plaintiffs then assert that they have alleged direct involvement of Defendants Hixon and Beyerlein.  (Id. at p. 24.)  The Court agrees with Defendants.

The Eighth Amendment's prohibition against "'cruel and unusual punishments' imposes duties on prison officials to provide 'humane conditions of confinement.'"   Hampton v. California, 83 F.4th 754, 765 (9th Cir. 2023) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  For example, "[t]he Amendment's protections extend to 'condition[s] of confinement that [are] sure or very likely to cause serious illness and needless suffering' in the future."  Id. at 766 (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)). To succeed on a claim of conditions of confinement, an inmate must first demonstrate he is "incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834.  Second, the inmate must show prison officials acted with deliberate indifference to that risk, which requires a subjective inquiry into a prison official's state of mind.  Id. at 838-39.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk or serious harm exists, and he must also draw the inference."  Id. at 837.

Regarding failure to protect, "[t]he Eighth Amendment requires prison officials to protect inmates from violence."  Wilk v. Neven, 956 F.3d 1143, 1147 (9th Cir. 2020) (citing Farmer, 511 U.S. at 833).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S. at 834.  Specifically, "a prison official violates an inmate's Eighth Amendment right only if that official is 'deliberately indifferent'—in other words, if the official is subjectively aware of a substantial risk of serious harm to an inmate and disregards that risk by failing to respond reasonably."  Wilk, 956 F.3d at 1147 (quoting Farmer, 511 U.S. at 837, 844-45).  Once an official is subjectively aware of a substantial risk of serious harm, the law requires "only that the [official] take reasonable measures to mitigate the substantial risk."  Id. (quoting

1  Castro, 833 F.3d at 1067).

2       Parents have a Fourteenth Amendment liberty interest in the companionship and society

3  of their children.  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).  "[O]nly official

4  conduct that 'shocks the conscience' is cognizable as a due process violation."  Porter v. Osborn,

5  546 F.3d 1131, 1137 (9th Cir.2008).  In a similar vein to claims of conditions of confinement and

6  failure to protect, "conduct which was not intentional, but rather deliberately indifferent, may

7  rise to the conscience-shocking level in some instances" that would state a claim for loss of

8  familiar relations.  See Muniz v. Pfeiffer, No. 1:19-cv-00233-JLT-CDB (PC), 2023 WL 184481,

9  at *9 (E.D. Cal. Jan. 13, 2023) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)),

10  adopted, 2023 WL 2413822 (E.D. Cal. Mar. 8, 2023).

11         a.  Policy-Based Claims Against Individual Defendants

12       As with their policy argument regarding deliberate indifference to a serious medical need,

13  Plaintiffs appear to be overlaying a claim of supervisory liability on their claims of conditions of

14  confinement, failure to protect, and loss of familial relations.  Indeed, Plaintiffs acknowledge this

15  point.  (ECF No. 38, p. 21.)  Therefore, at this juncture, the Court finds it necessary to discuss

16  that Plaintiffs appear at times to conflate two related but distinct concepts in Section 1983 claims

17  involving supervisory liability—namely, the legal standards in supervisory claims involving

18  personal conduct and supervisory claims not involving personal conduct (i.e., policy claims).  As

19  discussed above, supervisors may be liable for their own conduct "if there exists either (1) his or

20  her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

21  between the supervisor's wrongful conduct and the constitutional violation."  Starr, 652 F.3d at

22  1207 (quoting Hansen, 885 F.2d at 646).  Under this theory of personal involvement, "a plaintiff

23  must show the supervisor breached a duty to plaintiff which was the proximate cause of the

24  injury."  Id. (quoting Redman v. Cnty. of San Diego, 942 F.2d 1435, 1447 (9th Cir. 1991),

25  abrogated on other grounds, Farmer, 511 U.S. 825).  "The requisite causal connection can be

26  established . . . by setting in motion a series of acts by others."  Redman, 942 F.2d at 1447

27  (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978)).  It may also be established by

28  "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or

1  reasonably should have known would cause others to inflict a constitutional injury." Dubner v.

2  City & Cnty. of San Francisco, 266 F.3d 959, 968 (9th Cir. 2001).  "A supervisor can be liable in

3  his individual capacity for his own culpable action or inaction in the training, supervision, or

4  control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct

5  that showed a reckless or callous indifference to the rights of others."  Starr, 652 F.3d at 1208

6  (quoting Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998)).

7        In contrast, supervisory liability may exist without any personal participation if the

8  official implemented "a policy so deficient that the policy itself is a repudiation of the

9  constitutional rights and is the moving force of the constitutional violation."  Crowley, 734 F.3d

10  at 977 (internal quotation omitted).

11        Because the basis of Plaintiffs' claims of conditions of confinement, failure to protect,

12  and loss of familiar relations are "that these Defendants failed at the *policy* level with respect to

13  prisoners in similar situation as [decedent]," the correct legal standard requires Plaintiffs to

14  allege that the policy or lack thereof was a repudiation of the rights asserted, as well as the

15  moving force of the violations.  Plaintiffs appear to contend that by alleging that the same

16  policies affecting the Substance Abuse Treatment Facility and State Prison in Corcoran affect

17  other prisons, and that Defendants who were administrators were aware of Armstrong and

18  Coleman, that this is enough to allege that North Kern had 'a policy so deficient that the policy

19  itself is a repudiation of the constitutional rights and is the moving force of the constitutional

20  violation.'

21        In support of this position, Plaintiffs discuss the expert reports they cite in their amended

22  complaint that involve the Substance Abuse Treatment Facility and State Prison – Corcoran.

23  (ECF No. 38, p. 22.)  However, even if the Court were to take judicial notice of those expert

24  reports (which the Court has decided against), judicial notice would be limited to taking notice

25  that the filing of these expert reports occurred in Armstrong.  The substance of those reports

26  would be inappropriate for the Court to consider.  Lee, 250 F.3d at 690 (discussing that a court

27  may take judicial notice of a public record not for the truth of the facts recited therein, but for the

28  existence of the document).  In other words, the expert reports do little for Plaintiffs' policy

claims.

Finally, the Court looks to Plaintiffs allegations regarding other violence at other CDCR facilities and North Kern.  Plaintiffs cite CDCR data that reports there was an attack, at an unidentified facility, where an inmate reportedly slashed a neighboring inmate during medication distribution.  (ECF No. 28, ¶ 75.)  In another attack, at an unidentified facility, two inmates stabbed another 13 times.  (Id.)  In 2023, at North Kern, three inmates were murdered.  (Id. at ¶ 76.)  In an attack that occurred weeks after the death of decedent, an inmate convicted of a sex offense involving a minor was killed after being housed with convicted serial killer—Plaintiffs do not allege this prisoner had a developmental disability.  (Id. at ¶ 77.)  Plaintiffs also allege that on some unspecified date and time a prisoner at North Kern was killed by his cellmate after sentencing.  (Id. at ¶ 78.)  Finally, Plaintiffs allege that in the year leading to decedent's death, there was an average of "18 incidents per month involving battery on an inmate."  (Id. at ¶ 79.)  Plaintiffs do not fully allege what this statistic encompasses.  While these violent events are tragic, the Court finds that these allegations do little in demonstrating a custom or policy at North Kern regarding intake, assessment, and/or housing of inmates with developmental disabilities that deprives inmates of their constitutional rights.

Moreover, as with the medical deliberate indifference claim, the Court is unsure what custom or policy is with regard to these claims.  For example, it is unclear whether and how the medical screening by Dr. Truong is implicated in conditions of confinement, failure to protect, and loss of familial relations.  In addition, Plaintiffs are opaque as to whether the housing choice made by Does 2 and 3 was a custom or policy, or the merely the actions of unidentified individuals.  Other than these examples, the Court strains to discern any other custom or policy at North Kern that might be implicated.

The Court concludes that Plaintiffs have failed to state a claim for their claims of conditions of confinement, failure to protect, and loss of familial relations regarding policy-level failures.

      b.  <u>Individual Defendants Hixon and Beyerlein</u>

Plaintiffs argue that notwithstanding their policy-based arguments, they have alleged

personal involvement by Defendants Hixon and Beyerlein sufficient to state a claim.  (ECF No. 38, p. 24.)  Defendants respond that while these defendants were "proximately closer to the alleged unconstitutional conditions," the amended complaint still fails to state claims of conditions of confinement, failure to protect, and loss of familial relations.  (ECF No. 40, p. 10.)

In support of their position, Plaintiffs cite the following allegations.  Defendant Hixon, Warden of North Kern, and Defendant Beyerlein, CEO of North Kern, were responsible for the safety and security of prisoners at North Kern.  (ECF No. 28, ¶¶ 118, 119.)  "Upon information and belief," Defendants Hixon and Beyerlein were notified of threats that Holverstott had made against other inmates, of the danger Holverstott posed, and of decedent's vulnerabilities.  (Id.)  Plaintiffs assert that these allegations are sufficient to state claims of conditions of confinement, failure to protect, and loss of familial relations.  (ECF No. 38, p. 24.)  Plaintiffs argue that "the nature of [Defendants Hixon's and Beyerlein's] roles [are] such that they would have direct involvement regarding critical decisions."  (Id.)

The Court disagrees and finds that these are broad allegations that do not support a sufficient causal connection between a supervisor's wrongful conduct and the constitutional violation.  Starr, 652 F.3d at 1207-08.  Plaintiffs do not allege that Hixon or Beyerlein themselves made the decision to double cell decedent or to place him in a cell with Holverstott.  Moreover, these allegations do not support that Hixon or Beyerlein set into motion a series of actions of others leading to the housing assignment.  These limited allegations merely state the roles of Hixon and Beyerlein and that they knew of Holverstott's threat and decedent's vulnerabilities.  While Plaintiffs are not required to "have robust evidence," they must allege that Hixon or Beyerlein had either personal involvement in the constitutional deprivation or that there is a sufficient causal connection between the Hixon's and Beyerlein's wrongful conduct and the constitutional violations at issue.

In sum, the Court concludes that Plaintiffs have failed to state claims of conditions of confinement, failure to protect, and loss of familial relations with regard to both Plaintiffs' policy-based claims against all individual defendants as well as Plaintiffs' personal involvement

1  theory against Defendants Hixon and Beyerlein.  The Court will recommend leave to amend.[11]

2  **C. Americans With Disabilities Act; Rehabilitation Act; Cal. Gov. Code § 11135**

3  Defendants argue that Plaintiffs have failed to allege claims under the Americans with

4  Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the California Government Code

5  because the amended complaint lacks crucial elements, such as discrimination because of a

6  disability.  (ECF No. 40, p. 11.)  Plaintiffs respond that the cognitive test administered to

7  decedent upon entry into North Kern was outdated and that CDCR failed to follow certain

8  regulations already in place.  (ECF No. 38, pp. 28-29.)  Defendants are correct.

9  Title II of the ADA prohibits a public entity from discriminating against a qualified

10  individual with a disability on the basis of disability.  42 U.S.C. § 12132 (1994); Weinrich v.

11  L.A. Cnty. Metro Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).  The Supreme Court has held

12  that Title II of the ADA applies to state prisons.  Penn. Dept. of Corr. v. Yeskey, 524 U.S. 206,

13  210 (1998); see also Lee, 250 F.3d at 691.  Furthermore, "there is no question that defendant

14  CDCR, as a 'department [or] agency . . . of a State' is a 'public entity' for purposes of the ADA,

15  42 U.S.C. § 12131(1)."  Jones v. Scotland, No. 2:12-cv-00633 TLN, 2015 WL 461633, at *4

16  (E.D. Cal. Feb. 3, 2015), adopted, 2015 WL 1347412 (E.D. Cal. Mar. 23, 2015).  "Generally,

17  public entities must 'make reasonable modification in policies, practices, or procedures when the

18  modifications are necessary to avoid discrimination on the basis of disability, unless the public

19  entity can demonstrate that making the modifications would fundamentally alter the nature of the

20  service, program, or activity.'"  Pierce v. Cnty. of Orange, 526 F.3d 1190, 1215 (9th Cir. 2008)

21  (quoting 28 C.F.R. § 35.130(b)(7)).

22  To state a claim under Title II of the ADA, a plaintiff must allege four elements: (1) the

23  plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in

24  or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff

25

26  [11] For clarification, Defendants do not seek dismissal of Defendants Beltran and Ojeda for the claims of conditions of confinement, failure to protect, and loss of familial relations.  (ECF No. 33, p. 9 n.1.)  Moreover, Defendants do

27  not seek dismissal of the supervisory liability claim against Defendant Ojeda.  (Id.)  The Court reiterates that Defendant Monica Narvaiz is represented by separate counsel and did not join the motion to dismiss.  (See Dkt. No. 33.)  Because the supervisory liability brought through Section 1983 is against only Ojeda and Narvaiz (and Doe 2),

28  the Court need not discuss that cause of action herein.

was either excluded from participation in or denied the benefits by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1021 (9th Cir. 2010) (quoting McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004)); Weinrich, 114 F.3d at 978.

The proper defendant in an ADA action is the public entity responsible for the alleged discrimination. United States v. Georgia, 546 U.S. 151, 153 (2006). State correctional facilities are "public entities" within the meaning of the ADA. See 42 U.S.C. § 12131(1)(A) & (B); Penn. Dept. of Corrections, 524 U.S. at 210; Armstrong v. Wilson, 124 F.3d 1019, 1025 (9th Cir. 1997).[12]

Ordinarily, a plaintiff is not entitled to monetary damages against defendants in their official capacities. Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007) ("The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials in their official capacities."). However, the Eleventh Amendment does not bar ADA or RA suits against state officials in their official capacities for injunctive relief or damages. See Kohn v. State Bar of California, 119 F.4th 693, 695-96 (9th Cir. 2024). In addition, "[t]o recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant." Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001). The standard for intentional discrimination is deliberate indifference, "which requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." Id. at 1139. The ADA plaintiff must both "identify 'specific reasonable' and 'necessary' accommodations that the state failed to provide" and show that the defendant's failure to act was "a result of conduct that is more than negligent, and involves an element of deliberateness." Id. at 1140. When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate

---

[12] Both in their opposition and at the hearing, Plaintiffs have conceded that the appropriate defendant for these claims is CDCR and not the individual defendants. (ECF No. 38, p. 27 n.5.) Accordingly, the Court will recommend dismissal with prejudice with regard to all defendants except CDCR.

1  indifference test.  Id. at 1139.

2      Although "[t]he ADA prohibits discrimination because of disability," it does not provide

3  a remedy for "inadequate treatment for disability."  Simmons, 609 F.3d at 1022 (citing Bryant v.

4  Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison for

5  simply failing to attend to the medical needs of its disabled prisoners . . . .  The ADA does not

6  create a remedy for medical malpractice.")).

7      The Court agrees with Defendants that Plaintiffs have not alleged any exclusion, denial of

8  benefits, or discrimination occurred because of decedent's disability.  Rather, it appears that

9  Plaintiffs contend that decedent should have been classified as disabled notwithstanding that the

10  results of an allegedly outdated screening test that identified decedent as having normal cognitive

11  functioning.  However, that is not the same as denying decedent the benefits of housing or other

12  accommodation because he had a disability.

13      Plaintiffs' arguments are unavailing.  The Court has found that Plaintiffs have alleged

14  that decedent was an individual with a developmental disability.  Therefore, Plaintiffs' argument

15  that the cognitive test was outdated lacks force in establishing possible discrimination.

16  Plaintiffs' other argument clarifies that their position is not that CDCR failed to follow the

17  housing procedure in place, but had decedent been identified as having a developmental

18  disability or referred to DDP the Clark Remedial Plan procedure would have been used.  While

19  Plaintiffs agree with Defendants that CDCR's regulations standing alone do not violate the ADA

20  or federal law, Plaintiffs take issue with whether the regulations were followed.  However, the

21  ADA does not provide a remedy for "inadequate treatment for disability."  Simmons, 609 F.3d at

22  1022.  Relatedly, the Court agrees with Defendants point that it appears that it is Plaintiffs'

23  position that CDCR had adequate ADA policies in place but that certain individuals allegedly did

24  not follow those policies (see ECF No. 38, pp. 29-30), which undermines any claim that CDCR

25  was deliberately indifferent.  See Duvall, 260 F.3d at 1139.

26      The Court concludes that Plaintiffs have failed to state a claim as to the ADA, RA, and

27  Cal. Gov. Code § 11135.  The Court will recommend that the motion to dismiss be granted but

28  with leave to amend.

**D.  State Law Claims**

**1.  Wrongful Death**

Defendants argue that Plaintiff Albertano Torres' claim of wrongful death must be dismissed with prejudice because he failed to file a California Government Claim form for wrongful death, which is jurisdictionally fatal.  (ECF No. 33, p. 26.)  Plaintiffs respond that the form "provided the requisite notice for CDCR to be able to evaluate and respond to the claim." (ECF No. 38, p. 31.)  Plaintiffs' reliance on notice is of no moment.  Defendants are correct.

Under California law, "presentation of a claim to a public entity and its rejection are prerequisites to maintaining suit against the entity."   Nguyen v. Los Angeles Cnty. Harbor/UCLA Med. Ctr., 8 Cal. App. 4th 729, 732 (Cal. Ct. App. 1992) (citing Cal. Gov. Code, §§ 905, 945.4).  "Failure to comply with the mandatory requirements is fatal to the cause of action."  Id.  "It is not the purpose of the [California] claims statutes to prevent surprise."  City of San Jose v. Super. Ct., 12 Cal. 3d 447, 455 (Cal. 1974).  Instead, "the purpose of these statutes is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation."  Id.  "It is well-settled that claims statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances surrounding the claim."  Id.

That said, the California Supreme Court has interpreted the government claims statutes to allow for claims that have substantially complied with the required elements of the statute.  Id. at 456.  This, however, still requires that the claim have "some compliance with all of the statutory requirements."   Id. at 456-57 (italics omitted).  In other words, "the substantial compliance doctrine has application only when there is a defect in form but the statutory requirements have otherwise been met."  Nguyen, 8 Cal. App. 4th at 733.

Here, the first requirement of the government claims statute is that a claimant provide "[t]he name and post address of the claimant."  Cal. Gov. Code § 910(a).  Despite Plaintiffs' assertions or suggestion otherwise, the Government Claim form filed by counsel did not include decedent's father as a claimant.  (ECF No. 33-1, p. 91.)  While the form otherwise more or less complies with the remaining statutory requirements, it is nonetheless fatal to Albertano Torres'

claim of wrongful death.

Plaintiffs insist that CDCR had notice of decedent's death and that a wrongful death suit should have been apparent.  However, the California Supreme Court has been clear that "[s]uch knowledge—standing alone—constitutes neither substantial compliance nor basis for estoppel." City of San Jose, 12 Cal. 3d at 455.  Indeed, following City of San Jose, California appellate courts have explicitly held that "[w]here two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another."  Nelson v. Cnty. of Los Angeles, 113 Cal. App. 4th 783, 796 (Cal. Ct. App. 2003).

Under California law, wrongful death is a cause of action for the pain and suffering, and other expenses, of a decedent's closest surviving beneficiaries for the death of a person caused by the wrongful act or neglect of another.  Cal. Civ. Proc. Code § 377.60.  Meanwhile, a survival action is a separate cause of action that may be brought on behalf of the decedent, such as an estate, for loss or damage a decedent sustained before death.  Cal. Civ. Proc. Code § 377.34. Here, Plaintiffs allege that two persons suffered separate and distinct injuries from the same act or omission—namely, decedent's father suffered an injury under wrongful death for the death of his son compared to decedent's own injuries suffered pursuant to a survival action.  Castaneda v. Dept. of Corr. & Rehab., 212 Cal. App. 4th 1051, 1063, 151 Cal. Rptr. 3d 648 (Cal. Ct. App. 2013) ("[Decedent's] theory of recovery was based on his survival causes of action (his personal injuries while alive) while [the heir's] theory was based on her entirely distinct injury arising from [decedent's] death.").  Therefore, "each person must submit a claim, and one cannot rely on a claim presented by another."  Nelson, 113 Cal. App. 4th at 796.  Thus, the failure of decedent's father to file a claim is fatal to his claim of wrongful death.  And because "the statutory requirements have not been met by the person who has not filed a claim, . . . the doctrine of substantial compliance . . . does not apply."  Id. at 797.  Plaintiffs' attempt to repackage Nelson and Castaneda is unpersuasive.

Finally, Plaintiffs waiver argument is imprecise and unavailing.  The California Government Code provides that "[a]ny defense as to the sufficiency of the claim based upon a

defect or omission in the claim as presented is waived by failure to give notice of insufficiency with respect to the defect or omission . . . ."  Cal. Gov. Code § 911.  As stated above, there was no deficiency in "the claim as presented" as to decedent, and therefore, CDCR was not required to give any notice.  On its face, the statute does not require CDCR to review claim forms for all potential claims and inform all potential claimants of possible claims.  See Castaneda, 212 Cal. App. 4th at 1062.

The Court finds that any attempt to amend this claim would be futile because the failure by decedent's father to comply with the statutory requirements was fatal to the cause of action. Therefore, the Court will recommend granting Defendants' motion to dismiss as to the wrongful death claim with prejudice.  Sharkey v. O'Neil, 778 F.3d 767, 774 (9th Cir. 2015) (quoting Forman v. Davis, 371 U.S. 178, 182 (1962)).

### 2.   Negligent Supervision, Training, and Staffing and Negligence -Survival

Defendants generally argue that Plaintiffs' state law claims of negligent supervision and negligence survival action fail to state a claim for the same reasons as discussed above.  (ECF No. 33, p. 27; ECF No. 40, p. 14-15.)  Plaintiffs generally respond that they state a claim before making specific arguments for stating claims against Defendants Hixon, Beyerlein, and Dr. Truong.  (ECF No. 38, pp. 35-36.)  The Court agrees with Plaintiffs as to the negligence claims against Hixon and Beyerlein for their specific actions but otherwise agrees with Defendants.

In order to establish a claim of negligence under California law, "the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'"  Brown v. USA Taekwondo, 11 Cal. 5th 204, 213, 483 P.3d 159 (Cal. 2021) (quoting Nally v. Grace Comm. Church, 47 Cal. 3d 278, 292, 763 P.2d 948 (Cal. 1988)).  California law provides for a negligence – survivor cause of action that belongs to the decedent may be brought on behalf of the decedent by the decedent's personal representative or successor in interest.  Cal. Civ. Proc. Code § 377.34.  Damages for a survival action are limited to "the loss or damage that the decedent sustained or incurred before death." Id.  Regarding the negligent supervision, training, and staffing claim, Plaintiffs must allege that the Defendants' negligence in either supervising, training, or hiring resulted in the constitution

1  violation at issue.  Doe v. Capital Cities, 50 Cal. App. 4th 1038, 1054 (Cal. Ct. App. 1996).

2       The Court starts with Plaintiffs' general reliance on their allegations involving policy.  As

3  discussed above, the Court remains unsure as to what the exact policy is at issue.  Without this

4  understanding, the Court is unable to ascertain whether a duty existed for each Defendant.

5  Therefore, insofar as Plaintiffs' negligence claims seek to rely on a policy for the basis of their

6  claims, the Court will recommend dismissing these claims with leave to amend.

7       Next, the Court finds that Plaintiffs have stated a claim of negligence against Defendants

8  Hixon and Beyerlein.  Plaintiffs have sufficiently alleged that Hixon and Beyerlein had a duty to

9  protect decedent from violence at the hands of other inmates, which included housing

10 determinations.  (ECF No. 28, ¶¶ 62, 67.)  Plaintiffs have also alleged that Hixon and Beyerlein

11 allegedly failed to supervise or take reasonable steps to ensure decedent would be appropriately

12 housed, which breached their duty.  (Id.)  Finally, Plaintiffs sufficiently alleged that these failures

13 were the proximate cause of the strangling of decedent and ultimately his death.  (Id.)  Therefore,

14 the Court will recommend denying Defendants' motion to dismiss as to Plaintiffs' claims for

15 negligent supervision and negligence survival as to Hixon and Beyerlein for their personal

16 involvement.[13]

17      Finally, the Court finds that Plaintiffs have not alleged a negligence claim against Dr.

18 Truong.  Plaintiffs allege that Dr. Truong had a medical professional duty of care and that she

19 breached that duty by her purported failure to diagnose Plaintiff with a developmental disability

20 or refer him to DDP.  However, there remains a problem that the parties address from differing

21 viewpoints.  Plaintiffs urge that Dr. Truong's duty was "to provide a proper medical evaluation,

22 assessment, and screening to identify vulnerabilities that would place [decedent] at risk."  (ECF

23 No. 38, p. 36, citing ECF No. 28, ¶ 171.)  Meanwhile, Defendants take issue with that Dr.

24 Truong's duty did not encompasses a housing recommendation nor any custodial classification.

25 (ECF No. 40, p. 15.)  The Court agrees with Defendants that Plaintiffs have not alleged that Dr.

26 Truong's duty included a housing recommendation or custody classification.

27

28 [13] At this early stage, the Court declines to entertain the parties' arguments regarding whether state statutory immunity applies.

Moreover, the Court questions whether Plaintiffs have adequately alleged causation, even taking all allegations in the light most favorable to Plaintiffs.  As discussed above, Plaintiffs have not alleged that Does 2 and 3 were required to review, assess, and accept Dr. Truong's screening in making the housing determination.  Indeed, Plaintiffs include allegations to the contrary, that Does 2 and 3 "allegedly failed to consider all relevant case factors when requesting approving a bed move for . . . Holverstott."  (ECF No. 28, ¶ 55.)  Thus, Plaintiffs' suggestion that Dr. Truong legally caused decedent to be housed with a violent inmate appears, at this time, to be speculative.  Notwithstanding, the Court will recommend giving Plaintiffs leave to amend.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion to dismiss (ECF No. 33) be GRANTED IN PART and DENIED IN PART as follows:

1. The motion to dismiss as to the medical deliberate indifference claims against Defendants Truong, Macomber, Toche, Gipson, Hixon, and Beyerlein be GRANTED with leave to amend;

2. The motion to dismiss as to the conditions of confinement, failure to protect, and loss of familial relations claims against Truong, Macomber, Toche, Gipson, Hixon, and Beyerlein be GRANTED with leave to amend;

3. The motion to dismiss as to the ADA, RA, and Cal. Gov. Code § 11135 claims against Defendants Truong, Macomber, Toche, Gipson, Hixon, Beyerlein, Ojeda, and Beltran be GRANTED WITH PREJUDICE;

4. The motion to dismiss as to the ADA, RA, and Cal. Gov. Code § 11135 claims against Defendant CDCR be GRANTED with leave to amend;

5. The motion to dismiss as to the state law claim of wrongful death against Defendants Truong, Macomber, Toche, Gipson, Hixon, Beyerlein, Ojeda, and Beltran be GRANTED WITH PREJUDICE;

6. The motion to dismiss as to the state law claim of negligent supervision, training, and staffing against Defendants Macomber, Toche, and Gipson, be GRANTED with leave

1    to amend;

2    7.   The motion to dismiss as to the state law claim of negligent supervision, training, and

3         staffing against Defendants Hixon and Beyerlein be DENIED;

4    8.   The motion to dismiss as to the state law claim of negligence – survival action against

5         Defendants Truong, Macomber, Toche, Gipson, Ojeda, and Beltran be GRANTED

6         with leave to amend;

7    9.   The motion to dismiss as to the state law claim of negligence – survival action against

8         Defendants Hixon and Beyerlein be DENIED.

9         These findings and recommendations are submitted to the district judge assigned to this

10   action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  **Within twenty-**

11   **one (21) days** of service of this recommendation, any party may file written objections to these

12   findings and recommendations with the court and serve a copy on all parties.  Such a document

13   should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

14   district judge will review the magistrate judge's findings and recommendations pursuant to 28

15   U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

16   time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th

17   Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

18

19   IT IS SO ORDERED.

20   Dated:   **December 20, 2024**

         STANLEY A. BOONE
21       United States Magistrate Judge

22

23

24

25

26

27

28